IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION


| | | |
|---|---|---|
| SARA CASTLE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | CIVIL ACTION |
| | : | NO. 2:07-CV-0104-WCO |
| DR. MARTHA MARQUARDT, Dean | : | |
| of Health Services; JOAN | : | |
| THOMPSON, Vice President; | : | |
| DR. TRINA BOTELER, Executive | : | |
| Affairs Officer; IN THEIR | : | |
| INDIVIDUAL CAPACITIES, | : | |
| | : | |
| Defendants. | : | |

## ORDER

The captioned case is before the court for consideration of defendants'

motion for summary judgment [80-1] and plaintiff's motion to amend statements

of additional facts which the respondent contends are material and present a

genuine issue for trial [109-1].

## I.      Introduction

This case arises out of plaintiff's suspension from the Licensed Practical

Nursing Program at Appalachian Technical College (the "College") in Jasper,

Georgia.  In January 2007, plaintiff matriculated as a student at the College, and

she was suspended in August 2007.  Two days before she was suspended, plaintiff

reported one of her instructors to school administrators for violating state nursing regulations, and plaintiff claims that the school suspended her in retaliation for making the complaint. Defendants, all of whom are administrators at the College, immediately investigated plaintiff's complaints and, finding merit in plaintiff's contentions, fired the instructor one day later—the same day that the College suspended plaintiff. Rather than being based on a retaliatory motive, however, defendants contend that plaintiff's suspension was based on plaintiff's unrelated pattern of disruptive behavior at the school. Plaintiff brings 42 U.S.C. § 1983 claims alleging violations of her procedural and substantive due process rights under the Fourteenth Amendment and two claims under the First Amendment for the College's alleged retaliation against plaintiff's protected speech.[1]

---

[1] Plaintiff's prayer for relief requests, *inter alia*, $2,000,000 "[f]or General Damages for violation of Plaintiff's Civil Rights and intentional infliction of emotional distress and loss of her educational opportunity." (Pl.'s Compl. ¶ 21). That reference to intentional infliction of emotional distress, however, represents the sole mention throughout this lawsuit of what is a state-law *claim*, and is, of course, not a type of relief. For that reason, the court follows the parties' lead and treats the claim as abandoned.

## II.    Factual Background

### A.    *Plaintiff's Behavior*

#### 1.    March 2007 Disciplinary Warning

In March 2007, Patricia Vincent, one of plaintiff's instructors, expressed concern about plaintiff's behavior to defendant Dr. Martha Marquardt, whose title then was Director of Nursing and Allied Health.[2]  Vincent explained that plaintiff often disrupted class with disorderly behavior.  On March 13, 2007, Marquardt convened Vincent and plaintiff for a meeting to discuss plaintiff's conduct and to convey the school's demand that she improve her behavior or face expulsion.  At the end of the meeting, plaintiff signed a written disciplinary warning that reads:

> Your instructor Mrs. Vincent has expressed some concerns about your behavior in the classroom.
>
> **Immediate changes in your behavior include:**
>
> Come to class prepared, having read the assigned text.
>
> Discuss topics and bring up questions in class without interrupting the instructor, arguing, and being sarcastic.
>
> Respect other students' rights to confidentiality.
>
> Maintain good boundaries within the classroom setting, i.e., hold your issues to yourself.  Do not enlist others in

_____

[2]  On April 1, 2007, defendant Marquardt assumed the title of Dean of Health Services.

your struggle[,] as this is disruptive to the learning environment.

Recognize and change your negative attitude to a positive attitude.

**Failure to immediately make these changes will jeopardize your ability to continue in the Practical Nursing Program.**

(Ex. 2 to Marquardt Aff. 1) (emphasis in original). Vincent later told Marqaurdt that plaintiff's behavior improved.

## 2. The Petition

During the spring 2007 semester, plaintiff's first at the College, a petition seeking to change the College's passing-grade requirement was circulated among the nursing students. It is undisputed that plaintiff signed and supported the petition. The parties dispute, however, the extent to which plaintiff pressured her classmates to sign the petition. Defendants present evidence that plaintiff pressed her peers to sign the petition, going so far as to threaten at least one classmate, Max McGhee, that he "was going to be attacked by [his] fellow students if [he] didn't sign th[e] petition."[3] (McGhee Dep., Ex. 4 to Defs.' Statement Mat. Facts 14). Another student, Suanne Clayton, claims that plaintiff yelled at her in front

_____

[3] Plaintiff argues that McGhee and Clayton "acknowledged that the word 'attacked,' if used, only referred to peer pressure by other students who were attempting to get unanimity on the petition." (Pl.'s Resp. to Defs.' Statement Mat. Facts ¶ 8).

of other students and called Clayton a traitor.[4]  Plaintiff insists that she did not

attempt to intimidate her peers into signing the petition.  Despite plaintiff's

alleged threats and their professed fears, both McGee and Clayton eventually

signed the petition so as to avoid further harassment.[5]

        3.      Additional Reports of Plaintiff's Disruptive Behavior

On or about June 19, 2007, Marquardt learned from another instructor,

Sandra Holcomb, that a student reported that plaintiff threatened him and that he

feared plaintiff.[6]  Roughly two months later, on or about August 21, 2007, a third

---

[4]  Clayton testified that

> it became a big ordeal that [McGhee and I] wouldn't sign it.  And we
> were kind of in the hallway and [plaintiff] was yelling because I
> woudn't sign it and telling me I should sign it because she was calling
> me a traitor.

* * *

> And [despite the fact that I was there for an unrelated
> purpose,] because I went in [Marquardt's office,] I was again jumped
> because I was told I was a spy, and that I was going and talking to Dr.
> Marquardt like I was some kind of super spy.

(Clayton Dep., Ex. 3 to Defs.' Statement Mat. Facts 15).

[5]  Plaintiff argues that McGee's and Clayton's explanations for signing the petition
"are 'recent fabrications' and not admissible in evidence."  (Pl.'s Resp. to Defs.' Statement
Material Facts ¶ 10).  The court notes, however, that not only did plaintiff fail to rebut these
claims with evidence of her own, but no rule of evidence prevents the admission of testimony
by a sworn witness as to their motives for taking a certain course of action.

[6]  In an affidavit, Marquardt avers that "[o]n or about June 19 or 20, 2007 . . . an
instructor, Mrs. Sandra Holcomb, informed me that a student reported to her that Ms. Castle had
threatened him and that he was afraid of her."  (Marquardt Aff., Ex. 2 to Defs.' Statement

instructor, Carolyn Keating, reported to Marquardt that plaintiff had "been inappropriately loud and disruptive" during a class discussion about the final exam. (Ex. 3 to Marquardt Aff. 1). Keating also told Marquardt that Clayton reported to Keating that she felt threatened by plaintiff. Clayton told Keating that when Clayton refused to sign the petition seeking a change in the school's minimum grade requirements, plaintiff threatened her, warning her to "be careful in the parking lot." (Ex. 3 to Marquardt Aff. 1).

Plaintiff's relationship with Clayton continued to deteriorate, as plaintiff became convinced that Clayton threatened the integrity of the practical nursing program in two ways. First, plaintiff noticed that Clayton missed several classes without, to plaintiff's knowledge, suffering adverse consequences.[7] Plaintiff's second concern with Clayton was more subjective: according to plaintiff, Clayton received preferential treatment from Betty Sue Loflin, a clinical instructor. The two concerns festered in plaintiff's mind, leading to separate but related confrontations in August 2007 between plaintiff and Clayton and plaintiff and Loflin.

---

Material Facts ¶ 9). The record is not clear as to whether this report referred to McGhee or another male student.

[7] Plaintiff's observation that Clayton missed a substantial amount of class time is supported by the facts; indeed, the College issued a written disciplinary warning to Clayton cautioning her to avoid any further absences.

B.  *Events of August 2007*

1.    Plaintiff Confronts Clayton

On August 22, 2007, "everything kind of blew up."  (Clayton Dep., Ex. 3 to Defs.' Statement Mat. Facts 31).  On that date, the clinical class assembled, as usual, around 6:30 a.m.  It was not long before "[l]ots of yelling" filled the room. (*Id.*).  Plaintiff and Liz Mata, a classmate, insisted that Clayton explain her absences and that Loflin defend the perceived favoritism toward Clayton.  Despite demanding that Clayton and Loflin justify their allegedly improper actions, plaintiff refused to allow Clayton to defend herself, insisting that "[t]here is no defense; it's just the way I feel."  (Audio File, Ex. 6 to Defs.' Statement Material Facts, at 1:24.30).  After confronting Clayton, plaintiff and Mata left the hospital and headed toward the College, where they reported what they believed were infractions by both Loflin and Clayton.

2.    Plaintiff Reports Loflin and Clayton

When they arrived at the College following the confrontation with Clayton, plaintiff and Mata requested a meeting with defendant Joan Thompson, the Vice President of Academic Affairs, and Marquardt.  During the meeting, plaintiff and Mata reported that Loflin consistently released students after as little as one hour of clinical time, rather than requiring students to attend the full 6:45 a.m. through

3:15 p.m. schedule.  They also alleged that Loflin threatened the students that any report of her practice of releasing students early would be met with retribution. Plaintiff also indicated that Clayton had missed an "excessive number of additional days, and that she felt that Ms. Clayton had received preferential treatment from [Loflin]."  (Marquardt Aff. ¶ 12).

While any instructor would violate her duties to her employer and her students by providing less instructional time than scheduled, the infraction was particularly egregious in this context, as students are required by the state of Georgia to complete 700 clinical hours in order to graduate from a practical nursing program.   Recognizing the gravity of the charge against Loflin, Thompson and Marquardt initiated an investigation.  The next day, on August 23, 2007, Marquardt met with Loflin, who denied plaintiff and Mata's accusations. That same day, Marquardt and Thompson also interviewed six of the remaining seven students in the clinical class; of those, four admitted to the early dismissals immediately, while the remaining two admitted to the missed clinical time only after initially denying it.

On August 24, 2007—two days after plaintiff and Mata advised Marquardt of Loflin's improper dismissals, and one day after interviewing both Loflin and nearly all of the students in the class—Loflin was fired.  On August 27, 2007,

Marquardt notified the Georgia State Board of Nursing of Loflin's dismissal and the underlying reasons for the termination.

### 3. Clayton's Report

On August 23, 2007, Clayton reported plaintiff's alleged pattern of disruptive behavior to Thompson and Boteler. Clayton also filed a formal grievance, which read in part:

> On many occasions, [plaintiff] has cornered me, yelled at me[,] slammed her fists on tables[,] and called me names like trader [sic] and rat. She tried to turn the whole nursing class against me by telling them I was a rat [and] that Dr. Marquardt had me spying for her. She has made up lies about me and fellow students trying to cause conflict. In class she argues with teachers and is disruptive to our learning. [Plaintiff] has made false statements now about my husband and her and Liz Mata both have said they didn't think I should be in the program because I missed 2 clinical days and 2 class days . . . . [Plaintiff] and [Mata] have both yelled and bullied me, Miss Loflin, and others for a personal vendetta all because I would not side with them against certain employees at [the College]. . . . [Plaintiff] is mean and disruptive and a liar.

(Clayton Grievance, Ex. 4 to Boteler Aff., Ex. 9 to Defs.' Statement Mat. Facts).

### 4. Defendants' Investigation

In response to Clayton's report, on August 24, 2007, Boteler interviewed six students. Five of the students

> reported witnessing inappropriate, aggressive and/or threatening behavior by [plaintiff], including yelling at other students, consistent, determined efforts to get other students in the class to sign a petition she was circulating, telling other students they would be "attacked" if they did not sign the petition, "backstabbing and lying to other students," and generally disrupting the educational process.

(Boteler Aff., Ex. 9 to Defs.' Statement Mat. Facts ¶ 15). Four of the students refused to work with plaintiff and one requested a transfer to a different clinical practicum so as to avoid plaintiff. All five of the students present for the August 22, 2007 confrontation corroborated Clayton's version of the events.

Plaintiff challenges the College's version of its investigation, pointing to evidence that Boteler may have tailored her account of the interviews to support what plaintiff alleges was defendants' desire to rid the College of plaintiff. Boteler recorded detailed notes of her interviews with the students; the notes, however, do not identify the students' names,[8] and at least one student who was interviewed has reviewed all of the notes and concluded that none of them accurately reflects her interview with Boteler.[9] Those interviews constituted the

---

[8] Boteler insists that she maintained the students' anonymity in her notes for the students' protection. Clinging to the supposed virtue of confidentiality, Boteler has announced that she will not reveal the students' identities, even if this case requires her to testify in court.

[9] As the court noted in its order granting a preliminary injunction, "three (3) of plaintiff's eight (8) classmates testified [at the preliminary injunction hearing] that they had never witnessed plaintiff disrupt class or intimidate or bully anyone." (Oct. 5, 2007 Order 7

entire investigation conducted by Boteler or any other College administrators.[10]

Defendants never interviewed plaintiff or heard her side of the story.

Following the single-day investigation, Boteler concluded that "based upon Ms. Clayton's written complaint and the interviews conducted with the students from [plaintiff's] clinical practicum[,] . . . [plaintiff] had failed to meet the expectations communicated to her in the Disciplinary Warning issued to her on March 13, 2007, and had violated the Student Code of Conduct." (Boteler Aff., Ex. 9 to Defs.' Statement Mat. Facts ¶ 18). Boteler then discussed the incident with Thompson and Dr. Sandford Chandler, the President of the College, at which time "[t]he decision was made to dismiss [plaintiff] from the nursing program, effective immediately." (*Id.*).

### 5. August 24 Meeting

On August 24, 2007, defendants Boteler, Thompson, and Marquardt called a meeting with plaintiff and plaintiff's husband.[11] As Boteler later explained, "[a]t

---

n.6). Additionally, a former instructor "testified that plaintiff was neither disruptive nor a threat to any student or faculty member." (*Id.*).

[10] Following the August 22, 2007 incident, Loflin, the soon-to-be-fired instructor, directed the students to prepare written statements detailing the incident. Boteler did not read those statements until after plaintiff initiated this lawsuit.

[11] Boteler's notes from the meeting appear under the heading "Meeting with Sara Castle and her husband *to inform her of dismissal* from the program." (Ex. 6 to Boteler Aff., Ex. 9 to Defs.' Statement Material Facts) (emphasis added).

the beginning of the meeting, Ms. Thompson attempted to inform [plaintiff] of the accusations by her fellow students and instructors, the investigation into these accusations, and the decision by the college to dismiss her from the nursing program effective immediately." (Boteler Aff., Ex. 9 to Defs.' Statement Mat. Facts ¶ 21). Previously unsure of the purpose of the meeting, plaintiff responded incredulously to the news of her suspension. After a few brief exchanges with the officials, plaintiff became upset, repeatedly interrupted them, and scarcely gave the officials an opportunity to explain the grounds for her suspension.[12] After the meeting, the College sent plaintiff a letter explaining her suspension, and plaintiff appealed the decision through the College's formal appeals process. Electing to forgo a hearing in favor of considering only plaintiff's written appeal, the review board upheld the suspension. Plaintiff then resorted to this court.

### C. *Plaintiff's Reinstatement*

On September 12, 2007, plaintiff filed both her complaint in this case and a motion for a temporary restraining order. The court converted the motion to one

---

The court notes that all the evidence surrounding the August 24, 2007 meeting reflects defendants' intention—before the meeting began—to "dismiss" plaintiff from the practical nursing program. The repeated use of the word "dismiss" suggests that defendants intended to expel plaintiff on a permanent basis. Later, in reviewing plaintiff's appeal of the dismissal, the College took the position that plaintiff was not expelled, but rather had been suspended for the remainder of the semester.

[12] Plaintiff created an audio recording of the meeting that is part of the evidentiary record in this case. For that reason, the court is able to easily reconstruct what occurred.

for a preliminary injunction and held a hearing on September 26, 2007, at which it heard testimony. On October 5, 2007, the court granted plaintiff's motion and enjoined defendants from prohibiting plaintiff from returning to school. In an effort to ensure full compliance with the court's order, the College prohibited Boteler from participating in plaintiff's reinstatement. Defendants claim that Marquardt and Carolyn Keating, an instructor at the College, compiled materials to ease plaintiff's transition. Plaintiff contests that allegation, claiming that she "never received a make up [sic] packet for the three (3) weeks [she] missed during August and September." (Castle Aff., Ex. 8 to Pl.'s Mot. Amend Resp. ¶ 25).

### 1. Clinical Rotation in Ellijay

The College assigned plaintiff, along with another student, Collette Osborne, to a pediatrician's office in Ellijay, Georgia, to fulfill the required nursing leadership portion of her clinical rotation. It was not long before the parties butted heads again. Indeed, plaintiff claims that she complained about being placed in Ellijay the same day that she was assigned there; defendants pinpoint plaintiff's first complaint as coming in the form of an e-mail shortly after being informed of the Ellijay assignment. Plaintiff's chief concern with the Ellijay post stemmed from the fact that Clayton had previously worked in the same doctor's office. Plaintiff feared that Clayton's relationship with the office

staff would disadvantage her. A visit to the doctor's office by Clayton's husband, a police officer, compounded plaintiff's fears. Plaintiff insists that Clayton's husband visited the office in an attempt to intimidate her. However, the receptionist at the office who spoke with Clayton's husband reports that the husband asked only about a car accident that he was investigating. Regardless of the purpose behind the husband's visit, plaintiff reported the visit to Marquardt and filed a formal complaint with the College. The College informed plaintiff that because there was no alternative site for plaintiff to complete her pediatric clinical practicum, she would have to continue working in Ellijay. Defendants explain that after five weeks in Ellijay, plaintiff was placed at Piedmont Mountainside Hospital; plaintiff, however, denies that the placement ever occurred.

## 2. October 24, 2007 Incident

On October 24, 2007, tempers flared anew. During a break between classes, plaintiff informed her classmates that they would be subpoenaed to testify in this case. Many students objected vocally to the prospect of testifying, and the atmosphere became hostile. Under the impression that school officials had forbidden students from speaking with plaintiff, plaintiff told Clayton that it was acceptable for Clayton to talk to her. According to plaintiff, Clayton then confronted plaintiff about alleged lies that Clayton claimed that plaintiff had

spread about Clayton's relationship with McGhee. The spat drew the attention of other students, many of whom left the classroom to avoid the encounter. In the immediate aftermath of the confrontation, school officials forbade plaintiff from leaving the classroom, and Marquardt discussed the incident privately with Clayton. School officials then conducted an investigation, including discussing the matter with both students, but neither plaintiff nor Clayton was punished. After the incident, plaintiff never returned to the College.

### 3. Transfer to North Metro Technical College

On October 25, 2007, the court granted defendants' request for a telephone conference to consider whether the October 24, 2007 incident changed defendants' duties under the previously granted preliminary injunction. In particular, defendants asked the court whether the College could remove plaintiff from classes due to her allegedly disruptive behavior. Plaintiff countered that the College had been harassing her. Plaintiff also raised the possibility of transferring to another school. The court instructed the parties to arrange for plaintiff to transfer to a different practical nursing program.

After the court's telephone conference, the parties agreed that plaintiff would transfer to North Metro Technical College ("North Metro"). Ron Newcomb, the Vice President of Institutional Affairs and Advancement at North

Metro, began communicating with both the College and plaintiff in an attempt to facilitate plaintiff's transfer. Newcomb proposed various options to plaintiff, who needed to complete certain classes before being eligible to receive her degree. On plaintiff's request, Newcomb changed the North Metro enrollment plan to ensure that plaintiff was considered a transfer (as opposed to transient) student, which allowed plaintiff to receive her degree directly from North Metro. Newcomb also promised that North Metro would forgo tuition and other payments from plaintiff and offered plaintiff private instruction to ensure a smooth transition. Attempting to allay any lingering concerns, Newcomb also detailed a customized plan for plaintiff in an email dated January 4, 2008. Plaintiff, however, was unsatisfied. Deeming the proposed educational plan "punishment for the actions of one of [the College's] teachers and the administration," plaintiff "view[ed] this as a failure of the resolution promised by [the College]." (Ex. C to Marquardt's Second Amended Requests for Admission 2). In the end, despite Newcomb's efforts, plaintiff refused to attend classes at North Metro.[13]

---

[13]  Despite notice of North Metro's academic calendar, plaintiff was on vacation in Puerto Rico at the time that classes began in January 2008. Indeed, the record reveals no evidence that plaintiff made any effort to return to Georgia to attend classes at North Metro.

## III. Discussion

### A. *Legal Standard*

Summary judgment will be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Only those claims for which there is no need for a factual determination and for which there is a clear legal basis are properly disposed of through summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A court considering a motion for summary judgment must view the evidence in a light most favorable to the nonmoving party. *See Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). It is important to recognize, however, that this principle does not require the parties to concur on every factual point. Rule 56 "[b]y its very terms . . . provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Consideration of a summary judgment motion does not lessen the burden on the nonmoving party. The nonmoving party still bears the burden of coming

forth with sufficient evidence. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990). However, it is important to note the difference "between direct evidence and inferences that may permissibly be drawn from that evidence. Where a nonmovant presents direct evidence that creates a genuine issue of material fact, the only issue is one of credibility; thus, there is no legal issue for the court to decide." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). On the other hand, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the nonmovant relies, are 'implausible.'" *Id.* at 743. Adopting language from one of its sister circuits, the Eleventh Circuit explained:

> If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party. The nonmoving party's evidence must be taken as true. Inferences from the nonmoving party's "specific facts" as to other material facts, however, may be drawn only if they are reasonable in view of other undisputed background or contextual facts and only if such inferences are otherwise permissible under the governing substantive law. This inquiry ensures that a "genuine" issue of material fact exists for the factfinder to resolve at trial.

*Id.* (citation omitted). "Where the evidence is circumstantial, a court may grant summary judgment when it concludes that no reasonable jury may infer from the assumed facts the conclusion upon which the nonmovant's claim rests." *Id.*

B.    *Substantive Due Process*

Plaintiff argues that defendants violated her substantive due process rights under the Fourteenth Amendment by suspending her from the practical nursing program.  The substantive component of the Due Process Clause recognizes a limited class of "rights that a state may not remove, regardless of the process, as well as actions that can not be countenanced, regardless of the appropriateness of the process."  *McKinney v. Pate*, 20 F.3d 1550, 1560 n.15 (11th Cir. 1994) (en banc).  A school's decision to suspend a student is an executive act, *see id.* at 1557 n.9, and executive acts "contravene[] substantive due process rights only if, in the Supreme Court's words, the right affected is 'implicit in the concept of ordered liberty.'"  *C.B. v. Driscoll*, 82 F.3d 383, 387 (11th Cir. 1996) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)).  Because "[p]ublic education is not a 'right' granted to individuals by the Constitution," *Plyler v. Doe*, 457 U.S. 202, 221 (1982), "the 'right' to avoid school suspension may be abridged as long as proper procedural protections are afforded." *Driscoll*, 82 F.3d at 387; *see also id.* ("The right to attend a public school is a state-created, rather than a fundamental, right for the purposes of substantive due process."); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973) (holding that education is not a fundamental constitutional right).  Therefore, as a matter of law, plaintiff suffered no

substantive due process violation and, accordingly, summary judgment is appropriate for defendants on plaintiff's substantive due process claim.

## C.    *Procedural Due Process*

Plaintiff alleges that defendants violated her procedural due process rights by failing to provide a constitutionally adequate opportunity to be heard at the time defendants informed her of the decision to suspend her. Defendants argue that the August 24, 2007 meeting satisfied procedural due process requirements and that, regardless, plaintiff's claim fails because she did not avail herself of remedies under Georgia law.

Procedural due process requires notice and an opportunity to be heard.[14]

_____

[14]    Although the parties vigorously debate whether plaintiff received constitutionally adequate process, they do not dispute that plaintiff was entitled to some procedural due process. (*See* Defs.' Mot. Summ. J. 25) (conceding that "students enjoy *some* level of procedural due process protection, particularly where a student is subject to disciplinary penalties"). Nonetheless, it is incumbent upon the court to note that constitutional procedural due process rights arise only when a person suffers a deprivation of a protected property or liberty interest at the hands of the government. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972). Although courts frequently assume so for purposes of argument, neither the Supreme Court nor the Eleventh Circuit has determined whether a graduate student necessarily has a liberty or property interest in his or her continued enrollment. *See Nash v. Auburn Univ.*, 812 F.2d 655, 660 (11th Cir. 1987) ("[I]t is assumed by the parties and by the district court that appellants have property and liberty interests in their continued enrollment at [the] Auburn University [School of Veterinary Medicine] and that their interests enjoy the protections of due process. We will proceed to decide this appeal, making the same assumption, without expressing an opinion on the point."); *see also Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 222-23 (1985); *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 84-85 (1978); *Haberle v. Univ. of Ala. Birmingham*, 803 F.2d 1536, 1539 n.1 (11th Cir. 1986); *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007).

Where, however, state law creates the basis for a claim of entitlement to higher

-20-

*See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Nash*, 812 F.2d at 660. In the context of post-graduate education, "a statement of the charge" constitutes sufficient notice. *Nash*, 812 F.2d at 663. Because defendants provided plaintiff with a verbal statement of the charges against her at the August 24, 2007 meeting, the court is satisfied that defendants provided adequate notice to plaintiff. *See id.*; *see also Goss v. Lopez*, 419 U.S. 565, 582 (1975) ("There need be no delay between the time 'notice' is given and the time of the hearing."). The court's procedural due process analysis therefore focuses on whether defendants afforded plaintiff an opportunity to be heard consistent with the demands of the Fourteenth Amendment.

Although the right of procedural due process does not entitle a post-graduate student to a quasi-judicial trial, the right to cross-examine witnesses, or

---

education, a property interest exists. *Roth*, 408 U.S. at 577; *see, e.g.*, *Harris v. Blake*, 798 F.2d 419, 422 (10th Cir. 1986) (explaining that "actual payment of tuition secures" a property interest where state law provided that public "colleges 'shall be open . . . to all persons resident in th[e] state' upon payment of a reasonable tuition fee") (quoting Colo. Rev. Stat. § 23-50-109 (1973)); *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991) (applying New York contract law to find a property interest). Under Georgia law, "[a]ny individual 16 years of age or older who seeks access to quality instruction designed to develop or improve occupational competencies is eligible for admissions" to state technical colleges. STATE BOARD OF TECHNICAL AND ADULT EDUCATION POLICY AND PROCEDURES MANUAL § V.B.1; *see* O.C.G.A. § 20-4-11(2) (delegating authority to the State Board of Technical and Adult Education to promulgate all standards, rules, and regulations applicable to, *inter alia*, state technical colleges). As the Tenth Circuit did on similar facts in *Harris*, the court finds that this eligibility statement, combined with plaintiff's matriculation as a student at the College, is sufficient to create a protected property interest. *See Harris*, 798 F.2d at 422.

a "full adversary proceeding," *Nash*, 812 F.2d at 664, the right does encompass

the student having "the opportunity to be heard at a meaningful time and in a

meaningful manner."[15]  *Mathews*, 424 U.S. at 333.  No opportunity could be less

meaningful than one provided after a final adverse judgment has already been

made.  Thus, as a general rule, *Mathews* requires that a student be able to present

his or her side of the story *before* a decision is rendered as to the student's fate.[16]

*See id.*; *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) ("[T]he Constitution

requires some kind of a hearing *before* the State deprives a person of liberty or

---

[15]    The court notes that when a school dismisses a student based on academic performance—which was not the case here, as defendants suspended plaintiff on misconduct grounds—there is no need for a hearing.  *See Horowitz*, 435 U.S. at 85-86.

[16]  In *Mathews*, the Supreme Court explained that

> identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 334-35.  Because of the well-settled nature of the right to be heard *before* a final judgment is made, the court finds a more thorough analysis under the *Mathews* factors unnecessary.  The court notes, however, that the high "probable value" and low "fiscal and administrative burdens" of providing a pre-deprivation opportunity to be heard support the court's conclusion that, as a general matter, the Due Process Clause prohibits a school from imposing a substantial suspension or expulsion of a student before hearing the student's side of the story.  *Cf. Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 924 (6th Cir. 1988) (applying *Mathews* in the context of a student's expulsion from public school).

property."); *Goss*, 419 U.S. at 580 (observing that schools should "let [the student] tell his side of the story in order to make sure that an injustice is not done"); *id.* at 582 ("[A]s a general rule[,] notice and hearing should precede removal of the student from school."); *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 170 (1951) (Frankfurter, J., concurring) ("[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights."); *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 158 (5th Cir. 1961) ("Due process requires notice and some opportunity for hearing *before* a student at a tax-supported college is suspended for misconduct.") (emphasis added); *L.Q.A. v. Eberhart*, 920 F. Supp. 1208, 1217 (M.D. Ala. 1996) (finding no procedural due process violation when the plaintiff had "an opportunity to present his version of the facts *before he was suspended* from the school") (emphasis added).

Although defendants insist that plaintiff had an opportunity to be heard at the August 24 meeting, defendants' own account of the events reveals that no such opportunity existed. In an affidavit, Boteler explained that before the meeting and without interviewing plaintiff, "[t]he decision was made to dismiss [plaintiff] from the nursing program, effective immediately." (Boteler Aff., Ex. 9 to Defs.' Statement Mat. Facts ¶ 18). Moreover, defendants' statement of material facts confirms that "*[a]t the beginning of the meeting*, Ms. Thompson

attempted to inform Ms. Castle of the accusations by her fellow students and instructors, the investigation into these accusations, and *the decision by the college to dismiss her from the nursing program effective immediately*." (Defs.' Statement Mat. Facts ¶ 45) (emphasis added). Plaintiff's protestations at the meeting do not constitute a pre-suspension opportunity to be heard, as defendants had already decided to suspend her.

In the "rare and extraordinary" event, *Roth*, 408 U.S. at 570 n.7, however, where a student "poses a continuing danger to persons or property or an ongoing threat of disrupting the educational process," a school may forgo a pre-suspension hearing and provide only a post-suspension hearing. *Goss*, 419 U.S. at 582; *see also Bell v. Burson*, 402 U.S. 535, 542 (1971) (recognizing that procedural due process rights encompass a pre-deprivation hearing "except in emergency situations"); *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (explaining that state actors may constitutionally skip a pre-deprivation hearing in favor of a post-deprivation hearing only in "extraordinary situations"). "In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable." *Goss*, 419 U.S. at 582-83. Because the court finds an issue of material fact as to whether plaintiff "pose[d] a continuing danger to persons or property or an ongoing threat of disrupting the educational process," the court need not consider

whether defendants provided a sufficient post-deprivation hearing.  *Goss*, 419 U.S. at 582.

Defendants have not convinced the court that, as a matter of law, this is one of the "rare and extraordinary" cases where a post-deprivation hearing is constitutionally sufficient.  *Roth*, 408 U.S. at 570 n.7.  Neither the specific instances presented by defendants—the controversy surrounding the petition and the August 22 confrontation between Clayton, Loflin, plaintiff, and Mata—nor the cumulative disruptive effect that plaintiff had on the College's ability to educate its students persuades the court that no reasonable jury could conclude that plaintiff did not pose the type of "ongoing threat of disrupting the educational process" that would allow defendants to suspend plaintiff without first listening to her side of the story.[17]  *Cf. Hill v. Bd. of Trs. of Mich. State Univ.*, 182 F. Supp.

_____

[17]  To be sure, the court agrees that plaintiff behaved inappropriately on several occasions, and defendants have presented evidence to support that belief.  However, the record also reflects that some instructors and students vouch for plaintiff's non-disruptive and productive presence in class.  Moreover, the record contains reports of other students disrupting class; of administrators and instructors threatening students; and various other unsavory and academically counterproductive behavior.  Particularly in light of this circus-like atmosphere at the College, defendants have not convinced the court that, as a matter of law, plaintiff's behavior "pose[d] a continuing danger to persons or property or an ongoing threat of disrupting the educational process," *Goss*, 419 U.S. at 582; *cf. Hill*, 182 F. Supp. 2d at 630 (finding *Goss*'s standard for a post-suspension hearing satisfied when a student was arrested for inciting a riot and had a previous record of misconduct at the school); *Craig*, 801 F. Supp. at 590-91 (finding *Goss*'s standard satisfied when students, "in the presence of the principal, engaged in a brawl in the principal's office, damaging school property and endangering others nearby"); *Picozzi*, 623 F. Supp. at 1578 (finding *Goss*'s standard satisfied when law school administrators believed that a student had set a fire in a school dormitory).

2d 621, 630 (W.D. Mich. 2001) (approving student's suspension without a pre-suspension opportunity to be heard when the student was arrested for inciting a riot); *Craig v. Selma City Sch. Bd.*, 801 F. Supp. 585, 590-91 (S.D. Ala. 1992) (approving students' suspensions without a pre-suspension opportunity to be heard when the students participated in a brawl in the principal's presence, damaging school property in the process); *Picozzi v. Sandalow*, 623 F. Supp. 1571, 1578 (E.D. Mich. 1986) (approving student's suspension without a pre-suspension opportunity to be heard when law school administrators believed that a student had set a fire in a school dormitory). The court therefore finds that a reasonable jury could conclude that plaintiff did not represent the type of threat to the educational process that is necessary to excuse the College's failure to provide a pre-suspension hearing.

Defendants also argue that plaintiff fails to state a procedural due process claim because she had the right to an appeal and because Georgia law provides a remedy. Citing *Hudson v. Palmer*, 468 U.S. 517 (1984), defendants insist that because plaintiff "had a post-deprivation remedy, her appeal, of which she availed

---

To the extent that defendants intend to argue that plaintiff's pattern of behavior made the suspension appropriate, the court notes that "a deprivation of procedural due process is actionable under § 1983 without regard to whether the same deprivation would have taken place even in the presence of proper procedural safeguards." *Zinermon*, 494 U.S. at 126 n.11 (citing *Carey v. Piphus*, 435 U.S. 247, 266 (1978)).

herself . . . [p]laintiff received adequate process."[18]  (Defs.' Mot. Summ. J. 27).

It is true that, as a general rule, a plaintiff cannot state a procedural due process

claim under § 1983 unless she can show that there is no adequate state procedure

that would remedy the alleged procedural deprivation.[19]  *Zinermon*, 494 U.S. at

_____

[18]  Defendants also argue that "[a]lthough [plaintiff] chose to pursue a preliminary injunction in the federal court, such remedy was likewise available to her in the state court as well." (Defs.' Mot. Summ. J. 27).  To the extent that defendants intend to argue that plaintiff could have brought a § 1983 procedural due process claim in state court, they confuse the availability of a state law remedy with the availability of a state forum for bringing a federal constitutional claim.  Even assuming, *arguendo*, that this were the type of procedural due process case where a post-deprivation state remedy could vitiate the due process claim, the availability of a state judicial forum for bringing a federal claim would not suffice.  A state law remedy precludes a procedural due process claim under the United States Constitution because such a claim is premised on the state depriving the plaintiff of a liberty or property interest without providing adequate process, and the availability of the state remedy defeats the no-adequate-process element of the claim.  *See Horton*, 202 F.3d at 1300.  The fact that state law endows a state's courts with jurisdiction to entertain federal constitutional claims does not, however, indicate the availability of a state remedy.  *See id.* (explaining that if a state law remedy exists, a federal court could exercise supplemental jurisdiction to entertain the state claim, and, accordingly, demonstrating that a state remedy must be grounded in state law).  Regardless of the forum where a plaintiff brings a federal constitutional claim, the claim is based on the availability of a federal remedy, not a state remedy.  Thus, defendants' apparent argument that plaintiff could have vindicated her federal constitutional rights in state court fails to demonstrate that Georgia law provides a remedy for a plaintiff seeking to challenge the process by which she was suspended from a state educational institution.

[19]  As the Supreme Court has explained,

> The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process.  Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate.  This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the

126; *McKinney*, 20 F.3d at 1557. When, however, procedural due process requires a pre-deprivation opportunity to be heard, and the feasibility of providing that opportunity is unquestioned, the availability of any post-deprivation hearing is irrelevant. *See Hudson*, 468 U.S. at 534 ("The controlling inquiry is solely whether the State is in a position to provide for predeprivation process."); *Zinermon*, 494 U.S. at 132 ("[W]here the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking."); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547-48 & n.12 (1985) (holding that while "the existence of post-termination procedures is relevant to the necessary scope of pretermination procedures," a post-termination hearing cannot satisfy due process unless the plaintiff also receives a pre-termination opportunity to be heard).

A pre-deprivation hearing is feasible when officials act within discretionary authority entrusted in them by the state. *See Zinermon*, 494 U.S. at 135. Here, the state delegated to defendants the discretionary authority to suspend and expel students. Plaintiff , therefore, "is not simply attempting to blame the State for

---

deprivation, and any remedies for erroneous deprivations provided by statute or tort law.

*Zinermon*, 494 U.S. at 126.

misconduct by its employees. [She] seeks to hold state officials accountable for their abuse of their broadly delegated, uncircumscribed power to effect the deprivation at issue." *Id.* at 136. Thus, "[u]nlike . . . *Hudson*, this case does not represent the special instance of the *Mathews* due process analysis where postdeprivation process is all that is due because no predeprivation safeguards would be of use in preventing the kind of deprivation alleged." *Id.* at 139. To the contrary, this case exemplifies a situation where a pre-deprivation opportunity to be heard was feasible. Accordingly, the state's inadequate procedural safeguards permitted the precise type of due process violation alleged here. In the end, when state "officials fail to provide constitutionally required procedural safeguards to a person whom they deprive of liberty, the state officials cannot then escape liability by invoking . . . *Hudson*." *Zinermon*, 494 U.S. at 135.

Viewed in the light most favorable to plaintiff, the nonmoving party, the facts do not permit the court to conclude as a matter of law that plaintiff "pose[d] a continuing danger to persons or property or an ongoing threat of disrupting the educational process." *Goss*, 419 U.S. at 582. Thus, because defendants did not provide a pre-suspension opportunity to be heard, the court denies defendants' motion for summary judgment on plaintiff's procedural due process claim.

D.    *Retaliation for Protected Speech*

Plaintiff brings two distinct retaliation claims. First, she argues that defendants violated her First Amendment rights by suspending her in retaliation for plaintiff notifying the College about Loflin's pattern of dismissing students early and Clayton's repeated absences. Next, plaintiff claims that defendants retaliated for plaintiff bringing this lawsuit by harassing plaintiff following the issuance of the preliminary injunction.[20] Defendants respond to the first claim by arguing that the Loflin and Clayton reports had no bearing on plaintiff's suspension, which defendants insist was necessary because of plaintiff's disruptive behavior. Next, defendants reject plaintiff's post-preliminary-injunction retaliation claim as unsupported by the facts.

A retaliation claim "depends not on the denial of a constitutional right, but on the harassment [the plaintiff] received for exercising [her] rights." *Bennett v. Hendrix*, 423 F.3d 1247, 1253 (11th Cir. 2005). In order to be successful on her retaliation claim, plaintiff must demonstrate (1) that her speech was constitutionally protected; (2) that the defendants' retaliatory conduct adversely

---

[20] Plaintiff's amended complaint also charges defendants with intimidating some of plaintiff's classmates and causing them to withdraw from the College. To the extent that plaintiff seeks to bring legal claims on her classmates' behalf, the court grants summary judgment to defendants; plaintiff can make no colorable argument that she has standing to raise her classmates' claims. *See generally Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). Evidence, however, that "[a]nyone who responded to the [p]laintiff in a positive way was punished by the [d]efendants" may support by inference plaintiff's claim of retaliation, and will therefore be considered for that purpose. (Pl.'s Amended Compl. ¶ 44).

affected the protected speech; and (3) that there is a causal connection between the retaliatory action and the adverse effect on speech. *See id.* at 1250 (citations omitted).

### 1. Plaintiff's First Retaliation Claim

#### a. Constitutionally Protected Speech

Defendants argue that plaintiff's report of Loflin does not qualify as protected speech both because plaintiff does not qualify as a "whistleblower" and because plaintiff did not speak on a matter of public concern. Neither of these arguments holds any water, however, because both rely on incorrect legal premises. In the context of a student claiming that she was suspended in retaliation for exercising her First Amendment speech rights, there is no legal requirement that the plaintiff satisfy a special "whistleblower" standard. Likewise, outside of the public employee-employer context, the law does not require speech to fall within any definition of public concern.[21] *See Pinard v.*

---

[21] Plaintiff does not help her cause by citing *Finch v. Fort Bend Independent School District*, 333 F.3d 555 (5th Cir. 2003), for the legal standard applicable to free speech retaliation claims, since that case involved an employee-employer relationship and, accordingly, employed the public-concern test. *See Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 766 (9th Cir. 2006) (holding the public-concern test inapplicable in the student speech context because it applies only in the employee-employer context); *see also Velez v. Levy*, 401 F.3d 75, 97 (2d Cir. 2005) (distinguishing between a "straightforward *employment* retaliation suit" and a "more basic sort of retaliation claim").

The Eleventh Circuit has neither expressly rejected nor applied the public-concern standard in the student speech context. It has, however, recognized that the Supreme Court

*Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 766 (9th Cir. 2006) ("Although [the public concern test] is the appropriate mechanism for determining the parameters of a public employer's need to regulate the workplace, neither [the Ninth Circuit], the Supreme Court[,] nor any other federal court of appeals has held such a distinction applicable to student speech cases."). Rather, the standard articulated by the Supreme Court in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), governs plaintiff's speech. *See Pinard*, 467 F.3d at 765-67.

---

fashioned the public-concern test as a means of balancing a public employee's First Amendment speech rights with "the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Morgan v. Ford*, 5 F.3d 750, 754 (11th Cir. 1993) (quotation marks and citations omitted); *see also Denno v. Sch. Bd. of Volusia County, Fla.*, 218 F.3d 1267, 1275 (11th Cir. 2000) (recognizing the analytical distinction between student speech cases and public employee-employer cases by comparing the appropriate analysis under *Fraser* to the public-concern analysis due "in a case involving a public employer's discharge of an employee because of the employee's comments . . . on matters of public concern"). Recent Eleventh Circuit and Supreme Court case law makes clear the importance of the public employment context to the public-concern standard, as the public-concern standard now incorporates an inquiry into whether an employee plaintiff "spoke as an employee or citizen." *Boyce v. Andrew*, 510 F.3d 1333, 1342 (11th Cir. 2007) (discussing *Garcetti v. Ceballos*, 547 U.S. 410 (2006)). Furthermore, the Ninth Circuit's extensive discussion in *Pinard* of the public-concern test and that court's ultimate rejection of the test as applicable in the student-speech context supports this court's conclusion that the public-concern test does not apply to plaintiff's retaliation claim here. *See Pinard*, 467 F.3d at 766.

The court notes, however, that even if the public concern standard applied to plaintiff's speech, the court would have no difficulty finding that plaintiff's report of Loflin and Clayton constitutes a matter of public concern. It is difficult to imagine a topic of greater public concern than an allegation that a public educator engaged in a pattern of dismissing students far earlier than required by both her employer, a state school, and the state itself. *Cf. Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1288 (11th Cir. 2000) (finding, in the public employee-employer context, that an employee's report of a superior's illegal behavior was a matter of public concern). Thus, although the court finds plaintiff's speech protected by the Constitution for reasons unrelated to the public-concern standard, the court notes the extreme ease with which it would find that the facts of this case satisfy that standard.

In *Tinker*, the Court explained that student speech is constitutionally protected as long as it does not cause reasonable school officials to "forecast substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514. Here, defendants do not (and could not credibly) argue that they anticipated plaintiff's report of Loflin and Clayton to cause "substantial disruption or material interference with school activities." *Id.* Thus, the court finds that plaintiff's speech was constitutionally protected under *Tinker*. *See id.*

### b. Adverse Action

Defendants do not contest that plaintiff's suspension constituted an adverse action; regardless, the court will briefly address the prong. In *Bennett*, the Eleventh Circuit clarified the meaning of the adverse-action prong: "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." 423 F.3d at 1254. Among other factual situations, the *Bennett* court cited cases where the alleged retaliatory conduct was far less adverse than a long-term suspension from graduate school. *See id.* at 1255 (citing *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003) (denying summary judgment when the retaliatory conduct was the issuance of $35 worth of parking tickets); *Bart v. Telford*, 677 F.2d 622, 624-25 (7th Cir. 1982) (finding a "campaign of petty

harassments," including "[h]olding [plaintiff] up to ridicule for bringing a birthday cake to the office" constituted an adverse effect). In light of the Eleventh Circuit's approval of those cases, plaintiff's long-term suspension plainly constitutes an adverse effect.[22]

### c. Causation

The final element, the causal connection, is the most difficult on the facts of this case. As the court explained in its preliminary injunction order, "[p]laintiff's retaliation claim can be established 'through indirect evidence by proving a chronology of events from which retaliation can be inferred.'" (Oct. 5, 2007 Order 13) (quoting *Qvjit v. Lin*, 953 F. Supp. 244, 246 (N.D. Ill. 1997)). That fact, especially given the court's duty to view the facts in the light most favorable to plaintiff, creates a high barrier for defendants on their motion for summary judgment.

Defendants insist that plaintiff's report of Loflin had no bearing on her suspension. Of course, if that allegation were true, plaintiff's retaliation case

---

[22] The court notes that in the procedural due process context, the Supreme Court has distinguished between suspensions of ten (10) days or fewer and adverse actions that exceed that threshold, indicating the Court's assumption that a long-term suspension is a significant consequence. *See Goss*, 419 U.S. at 584; *see also Horowitz*, 435 U.S. at 86 n.3 (characterizing dismissal from medical school to be "more severe than the 10-day suspension to which the high school students were subjected in *Goss*"). Georgia law also uses ten days as a benchmark in distinguishing between "short-term" and "long-term" suspensions. *See* O.C.G.A. § 20-2-751.

would fail.  Yet, the parties spend the bulk of their briefs disputing the reasons for plaintiff's suspension, and both parties are able to marshal facts in support of their claims.  For example, a reasonable jury could conclude that defendants rushed their investigation of plaintiff—which failed to include an interview with plaintiff or her closest ally, Mata—because they intended to suspend her in response to her reporting Loflin and did not want to collect any exculpatory evidence that could hinder that intention.  To the contrary, plaintiff's pattern of disruptive behavior clearly supports defendants' proffered basis for suspending her.  Because facts that satisfy or disallow proof of an element of a claim are clearly material, and because both parties make colorable, fact-based arguments as to the reasons underlying plaintiff's suspension, the court finds a genuine issue of material fact that precludes summary judgment for defendants based on the merits of plaintiff's first retaliation claim.

## 2.    Post-Reinstatement Retaliation

Plaintiff amended her complaint after the court granted her a preliminary injunction, claiming that upon her return to the College, defendants retaliated by harassing her for bringing this lawsuit.  This second retaliation claim, however, fares much worse than plaintiff's first retaliation claim.  Plaintiff points to the following facts as evidence that defendants forced her to abandon her degree:

(1) plaintiff "was shunned and regaled [sic] by the teachers and students"; (2) one teacher "made a hostile speech against plaintiff"; (3) defendants arranged for plaintiff's Ellijay clinical assignment and refused to relocate her after plaintiff complained; (4) after the October 24, 2007 in-class confrontation between plaintiff and Clayton, "it was plaintiff who was locked in the classroom under guard"; and (5) defendants blocked plaintiff's transfer to North Metro. (Pl.'s Resp. Defs.' Mot. Summ. J. 17-18). The court finds that no reasonable jury could conclude that the facts support a First Amendment retaliation claim.

As an initial matter, the court rejects any legal liability attributable to defendants for plaintiff's several allegations related to non-parties' harassment. As defendants correctly note, vicarious liability, alone, cannot form the basis of a § 1983 claim. *See Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1180-81 (11th Cir. 2009). Because plaintiff has not presented any evidence or argument that provides a basis for holding defendants liable for the actions of plaintiff's teachers or classmates, the court will not consider any of plaintiff's allegations that require such a connection.

The second element of a retaliation claim, requiring a plaintiff to demonstrate that the defendant adversely affected the plaintiff, bars plaintiff's post-reinstatement retaliation claim. As discussed, "[a] plaintiff suffers adverse

action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett*, 423 F.3d at 1254. Yet, plaintiff presents no evidence that convinces the court that "a person of ordinary firmness" would feel the need to abandon his or her educational plans if faced with the allegedly retaliatory actions endured by plaintiff here. First, plaintiff was one of several students that the College placed at the Ellijay doctor's office. Indeed, the College assigned plaintiff and another student to the Ellijay site for completion of their clinical work at the same time.[23] Thus, although Ellijay was not plaintiff's first choice, there is no evidence that defendants placed plaintiff there as a punishment or refused to relocate her in retaliation for bringing suit. Additionally, plaintiff's complaints about defendants' alleged hindrance of her transfer to North Metro are not persuasive because plaintiff rejected several attempts by North Metro to accommodate her transfer. Further, at the time that students gathered in North Metro classrooms to begin the Spring 2008 semester, plaintiff was vacationing in Puerto Rico. Even when viewed in the light most favorable to plaintiff, the evidence does not support her post-reinstatement claim of retaliation. No reasonable jury could find that

---

[23] Additionally, the court notes that plaintiff's chief complaint about the Ellijay site was that Clayton, her nemesis at the College and the beneficiary of supposed favoritism, had previously worked there.

defendants harassed plaintiff in retaliation for plaintiff filing this lawsuit.

E.    *Qualified Immunity*

Finally, defendants argue that the doctrine of qualified immunity shields them from liability for all of plaintiff's claims.   "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Jackson v. Sauls*, 206 F.3d 1156, 1164 (11th Cir. 2000). The first step in the qualified immunity analysis is determining whether, "[t]aken in the light most favorable to the party asserting the injury[, the facts] . . .  show the [official's] conduct violated a constitutional right."[24] *Saucier v. Katz*, 533 U.S.

_____

[24]   The court recognizes that "the [two-step] *Saucier* protocol should not be regarded as mandatory in all cases."   *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).   Nonetheless, the Supreme Court continues to view the framework as "beneficial," and, having already discussed the merits of plaintiff's claims, there is no reason to abandon the *Saucier* sequence here.   *See id.*

Because, however, the court has already determined that plaintiff's procedural due process claim and one of her retaliation claims both raise genuine issues of material fact, the court need not engage in a separate analysis of whether the allegations establish constitutional violations.   *See Bennett v. Hendrix*, No. 1:00-CV-2520, 2004 WL 5545029, at *3 (N.D. Ga. Apr. 13, 2004), *aff'd*, 423 F.3d 1247 (11th Cir. 2005) ("[A] holding that the Plaintiffs' constitutional claims survive summary judgment necessarily means that the [constitutional violation] inquiry must be answered in the affirmative.); *see also Vroman v. Volusia County, Fla.*, No. , 2008 WL 681761, at *9 (M.D. Fla. Mar. 11, 2008) ("A genuine issue of material fact remains as to whether a violation of Plaintiff[']s constitutional rights occurred, thus, the Court

194, 201 (2001).

Next, if an official claiming qualified immunity demonstrates that his challenged actions were within the scope of his discretionary authority, the burden shifts to the plaintiff to demonstrate that the rights he seeks to vindicate were "clearly established" at the time of the alleged violation.[25] *See Vinyard*, 311 F.3d at 1346. Rights are clearly established if the controlling case law has "been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that [the conduct at issue] violates federal law." *Jackson*, 206 F.3d at 1164-65 (quoting *Lassiter v. Ala. A&M Univ. Bd. of Trs.*, 28 F.3d 1146, 1149 (11th Cir. 1994)). "The question is not whether a reasonable [defendant] would know the general principle that [certain actions] violate the law . . . [the question] is fact specific." *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1294 (11th Cir. 2000); *see also Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1210 (11th Cir. 2007) (distinguishing between a "one-dimensional" governmental decision and a "complex, multi-year process" in

---

must determine whether such rights were clearly established if they were violated.").

[25] "A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority." *Grayden v. Rhodes*, 345 F.3d 1225, 1231 n.12 (11th Cir. 2003) (citation omitted). The parties do not dispute that defendants acted within their discretionary authority, and the court finds no error in that assumption.

finding that the asserted equal protection violation was not clearly established).

Because, however, the right need only be "sufficiently clear that a reasonable official would understand that what he is doing violates the right," the facts of prior cases need not be "materially similar" to the facts supporting plaintiff's claim. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Thus, where "so few facts are material to [a] broad legal principle" that "precedents are hard to distinguish from later cases," a rigorous factually based comparison is unnecessary. *Vinyard*, 311 F.3d at 1351; *see also Griffin Indus.*, 496 F.3d at 1209 ("[C]ertain 'authoritative judicial decision[s]' may establish broad principles of law that are clearly applicable in a variety of factual contexts going beyond the particular circumstances of the decision that establishes the principle.") (quoting *Vinyard*, 311 F.3d at 1351).

### 1. Qualified Immunity & Plaintiff's Procedural Due Process Claim

Defendants argue that qualified immunity shields them from liability for plaintiff's procedural due process claim. The court disagrees. Undoubtedly, the dearth of Eleventh Circuit case law considering a school's long-term suspension of a graduate student on non-academic grounds without a pre-suspension hearing makes it difficult to compare plaintiff's claim to one in a factually similar case. Nonetheless, the court relies on several cases in finding that, absent "rare and

extraordinary" circumstances, *Roth*, 408 U.S. at 570 n.7, the right to a pre-deprivation hearing is clearly established. *See, e.g.*, *Zinermon*, 494 U.S. at 127; *Goss*, 419 U.S. at 580; *Dixon*, 294 F.2d at 158. Although defendants could not have found a factually identical case before denying plaintiff a pre-suspension hearing, there is no question that they could have concluded, from a casual review of the law, that such a hearing is required absent the most extreme circumstances. *See Griffin Indus.*, 496 F.3d at 1209; *Vinyard*, 311 F.3d at 1351; *cf. Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (explaining that the clearly established standard "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified"). Accordingly, the court finds that it has long been clearly established that, absent "rare and extraordinary" circumstances, the Due Process Clause requires a pre-deprivation hearing. *See Roth*, 408 U.S. at 570 n.7; *see also Zinermon*, 494 U.S. at 127; *Goss*, 419 U.S. at 580; *Dixon*, 294 F.2d at 158.

Here, defendants did not have grounds to believe that plaintiff's continued presence at the College constituted the sort of "rare and extraordinary," *id.*, or "emergency" threat, *Bell*, 402 U.S. at 542, to the educational process necessary to excuse their failure to provide a pre-suspension hearing. The court therefore rejects defendants' assertion of the qualified immunity defense as to plaintiff's

procedural due process claim.  *See Epps v. Watson*, 492 F.3d 1240, 1247 (11th Cir. 2007) ("[I]t is clearly established that an employee with a protected property interest in continued employment may not be terminated without due process of law.  As a result, at this stage, [the defendant] is not entitled to qualified immunity on [the plaintiff's] procedural due process claim.") (citation omitted).

2.      Qualified Immunity & Plaintiff's Retaliation Claim

Defendants argue that qualified immunity shields them from liability for retaliation because, regardless of the evidence supporting plaintiff's theory, defendants have offered a lawful explanation for her suspension.  The court agrees with defendants.  It is well settled that qualified immunity protects a defendant in a mixed-motives case where both parties present evidence supporting their alleged explanations for the defendant's adverse action.  *See Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1285 (11th Cir. 2008) ("[B]ecause [plaintiff] has not been able to present any evidence that [defendants'] decisions were not motivated, at least in part, by lawful justifications, [defendants] are entitled to qualified immunity."); *Stanley*, 219 F.3d at 1296 (explaining that qualified immunity applies "where, among other things, the record indisputably establishes that the defendant in fact was motivated, *at least in part*, by lawful considerations"); *Foy v. Holston*, 94 F.3d 1528, 1534-35 (11th Cir. 1996) ("Where the facts assumed for summary

judgment purposes in a case involving qualified immunity show mixed motives (lawful *and* unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity."); *see also Bogle v. McClure*, 332 F.3d 1347, 1355 (11th Cir. 2003) ("[I]n a case involving mixed motives, the presence of a jury issue about a defendant's improper intent does not necessarily preclude qualified immunity.") (citation omitted). Importantly, therefore, when a defendant offers uncontroverted evidence supporting a lawful explanation for an adverse action, a plaintiff's ability to state a claim for retaliation is insufficient to pierce the defendant's qualified immunity shield.[26]

---

[26] The court notes that in *Bogle*, a mixed-motives case, the Eleventh Circuit rejected the defendants' claim of qualified immunity because the plaintiffs presented evidence suggesting that the defendants' allegedly lawful basis for the adverse action was pretextual. 332 F.3d at 1356. A key distinction, however, separates *Bogle* from most mixed-motives cases. In a typical mixed-motives case, both the plaintiff and the defendant present evidence supporting their allegations regarding the basis for the defendant's adverse action. *See, e.g.*, *Rioux*, 530 F.3d at 1284; *Stanley*, 219 F.3d at 1296. In *Bogle*, however, the plaintiffs went a step further, presenting evidence that negated the defendants' proffered lawful explanation. *See Bogle*, 332 F.3d at 1350-51 (discussing evidence suggesting that defendants had expressly considered conducting the type of race-based employee "swap" that constituted the heart of the plaintiffs' claim). The difference between merely presenting a plausible alternative theory (as in a typical mixed-motives case) and actually rebutting the defendant's explanation (as was the case in *Bogle*) leads to the divergent outcomes.

Here, defendants present evidence supporting their proffered explanation for suspending plaintiff (her disruptive behavior), and plaintiff presents evidence suggesting an alternative explanation for the suspension (retaliation for plaintiff reporting Loflin). Unlike the plaintiffs in *Bogle*, however, plaintiff has not offered evidence that contradicts the facts supporting defendants' proffered explanation. Indeed, five months *before* plaintiff reported Loflin, defendants formally reprimanded plaintiff for disruptive behavior and warned plaintiff that

-43-

Here, there is no dispute that plaintiff engaged in the behavior that defendants claim led to her suspension. *See Rioux*, 520 F.3d at 1284 ("[T]he record undisputably established that objectively valid reasons existed for [defendant's allegedly retaliatory actions] because the incidents underlying the discipline that led to the termination *did in fact take place*.") (emphasis added). Regardless, plaintiff claims that defendants suspended her in retaliation for reporting Loflin. Even assuming, however, that defendants suspended plaintiff *in part* for reporting Loflin, plaintiff cannot defeat the qualified immunity defense. *See Rioux*, 530 F.3d at 1285 ("We cannot say that, even assuming [defendants] were acting with improper race-based animus[,] . . . reasonable officials faced with the same evidence of [plaintiff's unrelated] violations of work rules would have known that demoting [plaintiff] violated clearly established federal law."). Thus, qualified immunity applies to plaintiff's retaliation claim, making summary judgment appropriate for defendants.

_____

failure to improve her behavior would "jeopardize [plaintiff's] ability to continue" at the College. (Ex. 2 to Marquardt Aff. 1) (emphasis omitted). By contrast, in *Bogle*, the plaintiffs presented concrete evidence that the defendants' proffered explanation was a "sham designed to cover up" unlawful race-based motivation—a motivation that, unlike the facts that plaintiff alleges motivated defendants to suspend plaintiff in the instant case, would have arisen before the defendants' proffered explanation. 332 F.3d at1356. Therefore, *Bogle* does not change the court's analysis, and the line of cases granting qualified immunity to defendants who offer an alternative, lawful explanation—even in the face of evidence supporting the plaintiff's claims—applies. *See, e.g.*, *Rioux*, 530 F.3d at 1284; *Stanley*, 219 F.3d at 1296.

-44-

## IV. Conclusion

Because the court finds no genuine issue of material fact surrounding either plaintiff's substantive due process claim or plaintiff's retaliation claim stemming from her filing of this lawsuit, the court grants summary judgment for defendants on the merits of those claims. The court does find genuine issues of material fact as to plaintiff's procedural due process claim and plaintiff's retaliation claim stemming from her report of Loflin and Clayton. Summary judgment, however, is still appropriate for defendants on the remaining retaliation claim, because qualified immunity shields defendants from individual liability as to that claim. Finally, the court rejects defendants' arguments regarding qualified immunity as to the procedural due process claim, and, having found genuine issues of material fact as to that claim, denies summary judgment as to that single claim.

The case is now ripe for trial. A jury must determine whether plaintiff constituted the type of threat that excuses defendants' failure to provide a pre-deprivation opportunity to be heard. In the event that the jury returns a verdict for plaintiff, the court will charge the jury with the task of determining whether plaintiff suffered actual damages or, in the alternative, that plaintiff is entitled only to nominal damages. *See Zinermon*, 494 U.S. at 126 n.11 ("[I]n cases where the deprivation would have occurred anyway, and the lack of due process did not

itself cause any injury (such as emotional distress), the plaintiff may recover only nominal damages.") (citation omitted).

For the foregoing reasons, defendants' motion for summary judgment [80-1] is hereby **GRANTED in part** and **DENIED in part**.  Plaintiff's motion to amend statements of additional facts which the respondent contends are material and present a genuine issue for trial [109-1] is hereby **GRANTED** *nunc pro tunc* December 30, 2008.

**IT IS SO ORDERED**, this 2nd day of July, 2009.

s/*William C. O'Kelley*
WILLIAM C. O'KELLEY
Senior United States District Judge